WILKE FLEURY LLP
DANIEL L. BAXTER (SBN 203862)
dbaxter@wilkefleury.com
KEVIN R. BONSIGNORE (SBN 313346)
kbonsignore@wilkefleury.com
400 Capitol Mall, Twenty-Second Floor
Sacramento, California 95814

Telephone:  (916) 441-2430
Facsimile:  (916) 442-6664

Attorneys for Plaintiff CALIFORNIA
OPTOMETRIC ASSOCIATION

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA OPTOMETRIC ASSOCIATION, a non-profit corporation,<br><br>Plaintiff,<br><br>v.<br><br>ASSOCIATION CONSULTING GROUP, INC.,<br><br>Defendant. | Case No.<br><br>**COMPLAINT FOR DAMAGES**<br><br>**[Jury Trial Demanded]** |

2551309.1

WILKE FLEURY LLP
ATTORNEYS AT LAW
SACRAMENTO

COMPLAINT FOR DAMAGES

Plaintiff CALIFORNIA OPTOMETRIC ASSOCIATION ("COA") hereby alleges as follows:

## NATURE OF THE ACTION

1. This is an action for breach of contract, misrepresentation, rescission, and unfair competition arising out of the negotiation and consummation of a June 15, 2016 written agreement between COA and Defendant ASSOCIATION CONSULTING GROUP, INC. ("ACGI"), and ACGI's non-performance under that agreement.

2. Specifically, through multiple false and misleading representations regarding its capability to develop and customize COA's software programs in a manner that would allow COA to quickly, easily, and seamlessly access, maintain, and augment its membership database, ACGI induced COA to enter into a contract for the purchase of a white elephant known as the "Association Anywhere" association management system. After years of implementation efforts and COA's expenditure of significant money, time, and sweat equity, it was abundantly clear that ACGI's system simply did not work. Indeed, it is no exaggeration to say that far from improving the utility of COA's membership database, "Association Anywhere" had precisely the opposite effect; as of this writing, COA's membership database is in relative shambles, and is well-nigh unusable as a result of the byzantine and unworkable functionality introduced by ACGI, and ACGI's fundamental inability to improve that functionality, or otherwise provide a working system.

## THE PARTIES

3. COA is a non-profit corporation organized and existing under the laws of the State of California, with its principal place of business located in Sacramento, California. With a membership of several thousand optometrists, COA is one of the largest organizations of associated optometrists in the United States, and the preeminent optometric association in California.

4. ACGI is a corporation organized and existing under the laws of the State of Maryland, with its principal place of business located in Gaithersburg, Maryland. At all relevant times herein, ACGI was *not* qualified to do business in the State of California, nor is it presently so qualified.

## JURISDICTION AND VENUE

5. Jurisdiction is based upon diversity of citizenship among the parties. The amount in controversy exceeds $75,000, exclusive of costs. This Court thus has subject matter jurisdiction over

this action pursuant to 28 U.S.C. section 1332.

6. Venue is proper in this Court pursuant to 28 U.S.C. section 1391 (b)(2). Moreover, although the primary contract at issue (the "Software Agreement" referenced below) has a forum selection clause laying venue in state or federal courts within the State of Maryland, that clause is void ab initio under such provisions as California Corporations Code section 2203(a) inasmuch as, as stated above, ACGI was at no relevant time herein qualified to do business in the State of California.

## FACTUAL ALLEGATIONS

### COA's Electronic Membership Database

7. As a non-profit, membership-funded association, COA's lifeblood is its membership. As is the case with most organizations in this technological age, COA's membership data is maintained electronically. Among other things, COA's electronic database—accessed and used by both COA staff and COA members (and persons seeking membership)—is used to maintain member contact and practice information, add new members and subtract departing members, monitor membership dues and dues payment, track sponsorship and advertising, delineate between member classifications, oversee event registration and payment, and perform every other data entry function of any kind relating to membership information. In that vein, COA's database is indispensable to COA's ability to conduct its business.

8. From 1997 until the events at issue in this matter, COA's database (known as "IMIS") was relatively "old school." While the database adequately served COA's above-described data-entry and monitoring needs, it lacked the "new school" functionality through which COA personnel and COA members could most easily and seamlessly access and update of membership records. In addition to IMIS's relative lack of comprehensive web integrations and functionality, it was maintained on a local server in COA's offices, which required COA staff to maintain security, firewalls, and a separate web server for any web services offered from that database.

### ACGI, Association Anywhere, and the AMS Proposal

9. In 2015, COA began to consider the prospect of purchasing a new system to achieve the "new school" functionality it desired. That consideration led to exploratory discussions with a small handful of companies ostensibly capable of providing the system COA desired. In conducting

its search, COA's goal was to contract with a provider who could meet COA's needs without "breaking the bank."

10. ACGI touted itself as exactly that provider. Billing itself as an organization dedicated to building software to meet the specific needs of professional associations, ACGI representatives met with COA representatives in late 2015 to discuss COA's needs, and—purportedly—how ACGI could meet them. Among other things, ACGI stated orally and in writing that virtually every aspect of functionality requested by COA could be provided, including that 99 percent of COA's reporting needs would be fulfilled by stock database functionalities, and that ACGI staff would fully support the implementation and roll-out of a system purchased from ACGI.

11. After substantial discussions between the parties, on January 11, 2016, ACGI issued an "Association Anywhere AMS[1] Implementation Proposal" to COA ("the AMS Proposal"), a true and correct copy of which is attached hereto as Exhibit 1.

12. The AMS Proposal contained numerous representations regarding the robust capability of the Association Anywhere system ("Association Anywhere"). The AMS Proposal opened with an "executive summary" in which ACGI purported to be able to match its systems to COA's specific needs:

> ACGI Software appreciates the opportunity to submit the following business proposal to the California Optometric Association (COA), for consideration of its Association Anywhere AMS (association management system).
>
> *Through its analysis of COA's requirements, ACGI has developed a good understanding of COA's functional business needs.* In this proposal, we are attempting to communicate ACGI's approach and capabilities *for successfully implementing Association Anywhere® AMS as it relates to COA's stated requirements.*

(Id. at page 3 of 48 [emphasis in original].)

13. After that recitation, the AMS Proposal's executive summary made a number of specific representations regarding ACGI and Association Anywhere's ability to satisfy COA's aforementioned "functional business needs" and "stated requirements," including the following:

---

[1] "AMS" stands for "association management system."

       a.    "ACGI's experience will help COA to reduce time, risks, and costs related to migrating to a new system." (Id. at page 3 of 48.)

       b.    "Association Anywhere is a high-performance, enterprise system that will help COA to keep all of its data in a centralized location, and provide staff with robust association management features to effectively manage the functional areas of its business." (Ibid.)

       c.    "Real-time interaction between COA's staff, members, partners, and all other constituents, along with integration to third-party systems, promise the utmost integrity of COA's data and reporting." (Ibid.)

       d.    "Relationships and activities with all individuals and organizations will be tracked and managed to enhance customer service and improve organization efficiencies." (Ibid.)

       e.    "In addition to centralizing data, Association Anywhere will:

- automate a number of COA's process to improve staff productivity and visibility.
- provide staff with over 40 integrated modules for better visibility and records accuracy.
- allow robust meeting management features for even the most complex event registration needs.
- enhance COA's website with real-time, self-service features for all constituents.
- equip staff with intuitive business intelligence and reporting features for generating timely reports.
- provide enterprise financial features for accurate invoicing, payment processing, operations, reporting and auditing.
- provide enhanced marketing features for campaigns, member engagement, and tracking of data.
- improve the usual experience and communications for all constituents.
- support enterprise integration with all third parties, using ACGI's open APIs and web services." (Ibid.)

14. As to all of the above, ACGI promised that:

> These objectives will all be accomplished in a secure cloud-based environment, with powerful applications and a database that will scale for COA. Association Anywhere is easy to use and allows complete access with any Web-browser from any computer over any network connection. COA will use a system that leverages world-class technologies and productivity features to keep COA at the forefront of innovation.

(Ibid.)

15. The AMS Proposal contained additional representations concerning Association Anywhere's capabilities relative to COA, including the following:

a. "Association Anywhere AMS is a true enterprise-class database that will provide COA with a highly functional, scalable and secure solution." (Id. at page 7 of 48.)

b. "With over 40 plug-in modules, Association Anywhere is a comprehensive solution that will deliver a broad range of capabilities." (Ibid.)

c. "Association Anywhere's 100% browser-based interface is intuitive, allowing end-users to quickly navigate through the system." (Ibid.)

d. "With roles-based security, each of COA's employees will login to the system with a unique username and password authorizing him/her to access COA's AMS modules and data." (Ibid.)

e. "Association Anywhere organizes all member information from an unlimited number of sources and contact points into a single interface, greatly reducing the complexity and effort of managing member data." (Ibid.)

f. "By making members the center of your operations, Association Anywhere helps you attract and retain members at a lower cost, while simultaneously eliminating redundant data and improving staff efficiency." (Ibid.)

16. In addition to the above, ACGI made additional specific representations concerning Association Anywhere's ostensible range of capabilities, including in regards to such items as "marketing and communications," "meetings and events, "education/certification," "submissions management," "member e-services," "finance and accounting," "reporting and analysis," "system

configuration and dashboard," "data & system security details," "integration tools," and "mobile features." (Id. at pages 8 of 48 - 10 of 48.)

17. Following the above-described contents, the AMS Proposal presented a multi-page spreadsheet setting forth COA's various substantive system requirements, and ACGI's ability to meet those requirements. Importantly, COA's requirements were extensive and specific, and ranged from those pertaining to (a) membership/enrollment tracking to (b) billing and finances to (c) sponsorship/advertising to (d) events-related data, and more. (Id. at pages 12 of 48 - 18 of 48.) As to each of COA's 78 individually-identified requirements, ACGI specifically represented an ability to satisfy all of them via either its "Standard Base Product" (in the vast majority of instances) or through recommended "Customizations" or "Configurations," in almost every case providing specific commentary on how the relevant requirement would be accomplished. (Ibid.) The AMS Proposal then closed with several attachments, including a list of "Proposed Modules to Implement for COA," a "Conceptual Cost Estimate," an "Implementation Process Overview," a schedule of "Post-Implementation Support" and "Training & Documentation" services, and other materials. (Id. at pages 19 of 48 - 48 of 48.) Like their aforementioned counterpart contents, these attachments contained additional specific representations about ACGI's ability to perform, including specific representations concerning ACGI personnel's roles and responsibilities—including in relation to project management, user training, and question/complaint resolution—to ensure a successful implementation of Association Anywhere. Among the latter included the following:

a. "Project management is an imperative responsibility of ACGI. The ACGI project manager carries the responsibilities of communicating project status with COA on a regular basis, and ensures that goals are defined, milestones are achieved, schedules are met, costs are contained within budget, and that progress and changes are clearly communicated and documented." (Id. at page 25 of 48.)

b. "During COA's implementation, your assigned project manager will be your main point of contact for all customer support inquiries. COA's Project Manager will and resolve any

issues that arise."[2] (Id. at page 31 of 48.)

c. "Inquiries are made via telephone, e-mail and ACGI's Website. Software issues are assigned a severity level from 1 (being the highest) to 3 (being the lowest). Based on the level, CSR[3] will respond accordingly to resolve the issue." (Id. at page 32 of 48.)

d. "ACGI's Website is integrated with a sophisticated issue tracking system allowing customers to immediately notify CSR of a problem. Each inquiry is tracked from initial contact—your first support request—through problem resolution."

***Additional Communications and The Parties' Contracts***

18. Following ACGI's issuance of the AMS Proposal, ACGI and COA personnel conducted further discussions regarding the AMS Proposal and ACGI's capabilities. Among other things, COA representatives stressed that one of the key functionalities Association Anywhere would need to have was the ability to allow COA staff and members to quickly and easily add demographic and other member information (known as "attributes") that is crucial to determining member classification, and to track fees and assessments charged to members, and voluntary contributions paid by members. ACGI, primarily by and through Arj Devadas, Bruce Saunders, Meg Butcher, Alan Armstrong, Marc Durling, J. Michael Hoehn, Ruth Childers, Alison Horton, and Kevin Hostuler, assured COA representatives William Howe, Jenny Peterson, Jodi Haas, Mark Sira, Louise McAtee, Brenda Stewart, Sarah Harbin, Lauren Sutherland, and Julie Andrade that Association Anywhere included these functionalities, and that COA and its members would be able to do exactly what they desired by way of this data entry, access, and monitoring.

19. In addition to all of the above, of particular importance to COA's consideration of Association Anywhere were representations from ACGI (made in the above-quoted AMS Proposal and elsewhere) regarding the "comprehensiveness" of the system, such that COA—utilizing pre-existing reports—would be able to use Association Anywhere to generate 99 percent of the variety of membership reports it needed, without the need for any other third-party systems or software.

---

[2] "COA's Project Manager" refers to the project manager assigned by ACGI to the COA project.
[3] "CSR" stands for ACGI's "Customer Support and Relations" staff.

20. Based specifically and solely on its reliance on the various written and oral representations described above, COA decided to move forward with engaging ACGI. That engagement culminated in a two-step contractual process.

21. First, on March 20, 2016, the parties entered into a letter agreement for consulting services ("Consulting Agreement," a true and correct copy of which is attached hereto as Exhibit 2), under which ACGI—in exchange for compensation—agreed to "provide consulting services to assist [COA] in determining the Scope of Work, analyzing and documenting requirements, determining costs of customizations, identifying alternatives if available, determining priority of requirements, and drafting a project schedule."[4]

22. Second, on June 15, 2016, following the entry into the Consulting Agreement and ACGI's issuance of a second "Conceptual Cost Estimate" based on further communications between the parties and the finalization of the scope of work, the parties entered into a "Software Development and E-Service Enterprise Edition Agreement" ("Software Agreement"), a true and correct copy of which is attached hereto as Exhibit 3.

23. As formalized by the Software Agreement, COA purchased Association Anywhere from ACGI. The particular Association Anywhere suite purchased by COA was a combination of ACGI's aforementioned "Base Product Software" (referenced in the AMS Proposal as "Standard Base Product") and certain "Customizations," which suite was referenced in Paragraph 1.2 of the Software Agreement (p. 1) and broken down in "Attachment A" thereto (p. 14). All of the components of COA's Association Anywhere suite, which included those relating to "membership management," "reporting," "online self service," and "marketing and communications," were specifically recommended by ACGI, and purchased by COA specifically and solely based on ACGI's representations regarding the efficacy of those components. The Software Agreement, including through "Attachment C" thereto, also reiterated ACGI's maintenance and support obligations; importantly, while Paragraph 1.1.B.(1) of Attachment C stated that "ACGI will provide eight (8) hours of Customer Support per month," that time limit did not apply to basic functionality problems

---

[4] That Consulting Agreement was amended on June 7, 2016. (See Exh. 3 hereto.)

with Association Anywhere: "The resolution with the Base Product Software, wherein the Base Product Software is not in substantial compliance with the SOW, shall not be subject to the eight hour per month limit." (Id. at p. 16.)

24. Pricing under the Software Agreement was broken down by an initial "three months Monthly Recurring Charges," hourly scope of work and "additional" services, and recurring monthly "e-service charges" in the amount of $2,942 per month. (Software Agreement, p. 15.) As to term, Paragraph 12.1 specified that the Software Agreement "shall remain in effect for an initial term of five (5) years, and shall automatically renew thereafter on a year to year basis unless the terminating party gives written notice of termination at least sixty (60) days prior to the end of the initial or any renewed term." (Id. at p. 10.) All told, the financial outlays that COA has made to date total approximately $618,564.82, consisting of $507,373.82 for the design, implementation, and "launch" of Association Anywhere, plus $111,201 in e-service charges.

25. The Software Agreement warrants Association Anywhere and ACGI's ability to perform under the contract. Among other things, in Paragraph 10.2, ACGI promised to perform "Installation, Maintenance and Additional Services" "in a professional and workmanlike manner with a level of skill in the area commensurate with the requirements of the work to be performed." (p. 12.)

***Post-Execution Events***

26. With the executed Software Agreement in hand, with the anticipated skill and support of ACGI, Association Anywhere, and ACGI's personnel, and ACGI's projection of a "go-live" date— that is, the point at which the system would be launched for daily use—of June 2017, COA was bullish on the future of its database. Indeed, on June 21, 2016, six days after the execution of the Software Agreement, ACGI personnel conducted a "boot camp" with COA staff at the latter's Sacramento headquarters. During that session, ACGI representatives mapped out the process for entering membership enrollment information within Association Anywhere, including the various classifications of COA members and the steps for enrolling a member. Additional "boot camp" sessions were held on July 20, August 31, and November 11, 2016. Those sessions, among other things, dealt with how to set-up membership within Association Anywhere that would allow the system to produce functionalities like online member joining, membership-related reports, billing,

membership workflow, and the like. Both before the execution of the Software Agreement and in the course of the "boot camp" sessions, COA representatives stressed the complexity of COA's member dues structure, and also emphasized the need for the system to offer monthly autopay installment billing of membership dues. In response, ACGI—primarily through Alan Armstrong, Alison Horton, and Marc Durling—stated that they had determined the hierarchy of COA's membership classifications and how the dues associated with each would be set up, and assured COA staff that Association Anywhere would be able to handle COA's dues-related requirements.

27. As with any system change/upgrade, COA and its staff expected initial "bugs," "glitches," and "growing pains" associated with the installation, implementation, and transition to Association Anywhere. And, such bugs manifested. However, those bugs were by no means transitory. From June 21, 2016 forward, COA personnel entered various "tickets" under which concerns, issues, and problems were transmitted to ACGI per the provisions of the Software Agreement highlighted at Paragraph 16(b)-(d) of this Complaint. Those tickets, which currently number in the thousands, largely pertained to membership workflow issues. By way of representative sampling, those tickets included the following:

  a. Ticket COA-1072 (October 25, 2016): This ticket arose out of the non-functionality of Association Anywhere's online function. ASCI's response to this ticket was to indicate that it would take 26 hours, at additional "out-of-scope" expense to COA, for this issue to be fixed. This statement was false, as the online functionality at issue was specifically within the scope of the Software Agreement.

  b. Ticket COA-1095 (October 25, 2016): This ticket embeds notes and screenshots of problems with Association Anywhere's membership workflow functionality. As of the filing of this Complaint, the ticket has still not been completed.

  c. Ticket COA-1291 (April 21, 2017): This ticket requests that lists of societies and political action committees be converted to dropdown format for ease of use by joining or renewing membership applicants. Additionally, the ticket asks that based on the selections made, the system automatically "map" to the appropriate memberships. Despite the fact that both of these constitute basic functionalities for an online "join" function, ACGI has yet to complete this ticket;

indeed, ACGI has done nothing on this ticket since shortly after it was submitted, demanding that COA pay an additional $24,000 to enable this functionality.

        d.      Ticket COA-1327 (May 16, 2017): This ticket deals with Association Anywhere's membership workflow functionality's inability to generate an accurate receipt for a purchase made, such as membership—one of the most basic functions attending to a membership recordkeeping system. This ticket embedded a number of inaccurate receipts. As of the filing of this Complaint, this ticket has not been completed, and nothing has occurred relative to this ticket for well over a year.

        e.      Ticket COA-1501 (December 20, 2017[5]): As the aforementioned online "join" function was becoming ever more convoluted and unwieldy, COA—through this ticket—asked that each step in the "join" process be numbered so users could better proceed through the process. However, as with other of the tickets described herein, ACGI demanded separate and additional payment for this functionality. As of the filing of this Complaint, this ticket has not been completed, and nothing has occurred relative to this ticket for well over a year.

        f.      Ticket COA-1503 (December 20, 2017): Similar to Ticket COA-1501, this ticket also arose out of the inefficacy of Association Anywhere's membership workflow function, and asked that the font, coloring, and styling of the images within that function be revised to provide greater ease of use. As of the filing of this Complaint, this ticket has not been completed, and nothing has occurred relative to this ticket for well over a year.

        g.      Ticket COA-1504 (December 20, 2017): This ticket also sought to clarify the convolution and fragmentation of Association Anywhere's membership workflow function. Specifically, it asked ACGI to alter the workflow protocols so that after the "status" page, the customer is navigated to select their local membership chapter,[6] whereupon all items are dropped into the customer's "shopping cart," removing the need for a customer to have to individually select each

---

[5] As can be seen from the next several entries, several tickets were generated on this same date. These tickets arose out of a telephonic meeting between COA and ACGI regarding membership workflow issues.

[6] COA membership is geographically divided by regional "societies."

1   membership designation. As of the filing of this Complaint, this ticket has not been completed, and
2   nothing has occurred relative to this ticket for well over a year. Indeed, ACGI has again demanded
3   separate and additional payment to fill this ticket.

4           h.    Ticket COA-1505 (December 20, 2017): This ticket requests ACGI to clarify
5   Association Anywhere's convoluted membership workflow functionality, and asks ACGI to convert a
6   list of COA's 25 local societies into a "drop down" format instead of the current format, whereby
7   users have to use a multi-page process to select their chapter. As of the filing of this Complaint, this
8   ticket has not been completed, and nothing has occurred relative to this ticket for well over a year.

9           i.    Ticket COA-1507 (December 20, 2017): This ticket asked for changes to
10  Association Anywhere's membership workflow styling—changing certain difficult-to-use symbols
11  into actual English words—to improve ease of use for customers. As of the filing of this Complaint,
12  this ticket has not been completed, and nothing has occurred relative to this ticket for well over a year.

13          j.    Ticket COA-1510 (December 20, 2017): This ticket asks for a basic report
14  showing membership applications started but not completed…an eminently basic functionality.
15  Instead of completing the ticket, ACGI demanded separate and additional payment to do so, and has
16  performed no work on this ticket for well over a year.

17      28.    Overall, of the well-over one thousand tickets that have been generated since the
18  installation of Association Anywhere, the vast majority remain "open," as evidenced by ACGI's own
19  documentation.

20      29.    In addition to the problems evidenced by the above-referenced tickets, Association
21  Anywhere lacks other critical—and fundamental—functionalities. Among other things, Association
22  Anywhere is unable to generate an accurate membership roster, as well as numerous other
23  membership-related reports. That failure is so acute that Association Anywhere is unable to remedy
24  the failure either with reference to pre-existing reports or through the use of third-party software.
25  Association Anywhere is also fundamentally unable to provide the dues-related functionality it was
26  specifically represented to have, including the ability to offer monthly autopay installment billing to
27  members. Additionally, and in contravention of ACGI's oral and written representations, Association
28  Anywhere (a) does not permit COA members to view real-time billing statements or to make online

membership-related changes, (b) delivers incorrect data concerning member numbers and dues amounts, (c) provides confusing and duplicative results in response to basic searches, (d) fails to allow exhibitors/sponsors/advertisers to view or pay invoices on line, and (e) fails to allow for the ready input of member employment information.

30. The failure of ACGI and Association Anywhere to perform under the terms of the Software Agreement and Consulting Agreement, and in conformity with ACGI's independent written and oral representations, is a continuing failure that exists until the present day, as evidenced by the aforementioned five-year term of the Software Agreement.

31. Overall, Association Anywhere has shown itself to be ineffective, and ACGI personnel have been unable and/or unwilling to remedy the significant defects resident in the system. In short, despite ACGI's numerous written and oral promises regarding its understanding of COA's needs, and the "centralized," "integrated," and "comprehensive" capabilities of Association Anywhere that would "reduce time, risks, and costs" and "keep COA at the forefront of innovation," Association Anywhere has not only shown none of those attributes, but it has failed to adequately perform even the most basic tasks attending to membership recordkeeping. And, when repeatedly contacted for assistance on a panoply of issues, including in the weeks and months preceding the filing of this Complaint, ACGI personnel have—almost without exception—been unable or unwilling to resolve those issues, or demanded separate payment to achieve such resolution, even though all of the issues raised are well within the scope of work defined by the Software Agreement. Simply stated, COA—despite intensive efforts to work through the failings of Association Anywhere—has not received what it paid for.

## FIRST CAUSE OF ACTION

### (Breach of Written Contract)

32. COA realleges and reincorporates by reference each and every allegation contained in Paragraphs 1 through 31 of this Complaint as though fully set forth herein.

33. COA has duly performed and satisfied all conditions, promises, and obligations required to be performed or satisfied by it in accordance with the terms and conditions of the Consulting Agreement and Software Agreement, except for those conditions, promises, and obligations excused by ACGI's own contractual breach and/or non-performance.

34. As discussed above, Association Anywhere does not work, and fails to adequately provide the basic functionalities attendant to an association management system. Moreover, by failing to address and resolve the above-discussed "tickets" submitted by COA, ACGI has breached those portions of the Software Agreement setting forth ACGI's maintenance and support obligations, including the provisions of Attachment C requiring ACGI to resolve problems involving Association Anywhere's failure to substantially comply with the system's scope of work. ACGI's failure to determine and implement a proper scope of work to address COA's specifically-articulated needs also constitutes a breach of the former's obligations under the March 30, 2016 Consulting Agreement. All of these failings also evidence a breach of Paragraph 10.2 of the Software Agreement, under which ACGI promised to perform "Installation, Maintenance and Additional Services" "in a professional and workmanlike manner with a level of skill in the area commensurate with the requirements of the work to be performed."

35. As a result of ACGI's contractual breaches described herein, COA has been damaged in an amount to be established at trial, but in no event less than the minimum jurisdictional limits of this Court. Specifically, and pursuant to Paragraph 10.5 of the Software Agreement (p. 9), COA is entitled to reimbursement of all sums paid to ACGI under the Software Agreement, and is also entitled to reimbursement of all sums paid to ACGI under the Consulting Agreement.

WHEREFORE, COA prays for relief as set forth below.

### SECOND CAUSE OF ACTION

**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

36. COA realleges and reincorporates by reference each and every allegation contained in Paragraphs 1 through 35 of this Complaint as though fully set forth herein.

37. Every contract contains an implied duty of good faith and fair dealing under which each party promises to cooperate with the efforts of the other to perform under the contract, and to refrain from taking any act that would make the other party's performance thereunder difficult or impossible, or that would deprive the other party of the benefits of the contract.

38. By and through their failure to honor their obligation to provide contractually-required systems and services to COA, and to insist that COA pay additional sums to obtain such systems and

services, ACGI has hindered COA from realizing the benefits of the bargained-for contract.

39. As a proximate result of ACGI's acts in violation of the implied covenant of good faith and fair dealing, COA has been damaged in an amount to be established at trial, but in no event less than the minimum jurisdictional limits of this Court.

WHEREFORE, COA prays for relief as set forth below.

### THIRD CAUSE OF ACTION

### (Intentional Misrepresentation)

40. COA realleges and reincorporates by reference each and every allegation contained in Paragraphs 1 through 39 of this Complaint as though fully set forth herein.

41. Before the Consulting Agreement was entered into, and then again before the Software Agreement was entered into, ACGI—both in writing and orally—made the false representations of material fact described in Paragraphs 10 through 19 and 26, *supra*, including in regards to the "centralized," "integrated," and "comprehensive" capabilities of Association Anywhere that would "reduce time, risks, and costs," and "keep COA at the forefront of innovation." These written and oral statements were more than mere "puffery," but were instead explicit statements based specifically on ACGI's purported knowledge and understanding of COA's particularized needs, and ACGI's purported ability to meet those needs.

42. ACGI's various written and oral representations were intended to induce, and did induce, COA's actual and justifiable reliance thereon, in the form of its entry into the Consulting Agreement and Software Agreement, and payment/performance thereunder. At the time ACGI made these representations, it knew said representations were false, or made the representations with reckless disregard as to whether they were true or false.

43. Had COA known of the false nature of ACGI's representations, it would not have consented to entry into the Consulting Agreement or Software Agreement, nor would it have attempted and continued performance—or made payment—thereunder.

44. As a proximate result of ACGI's fraudulent misrepresentations, COA has been damaged in a sum to be established at trial, and in any event in excess of the minimum jurisdiction of this Court.

45. ACGI's conduct, alleged above, was carried out in reckless disregard of COA's rights, and was willful, wanton, malicious, and outrageous conduct that subjected COA to cruel and unjust hardship in conscious disregard of COA's rights, thus warranting an award of punitive damages.

WHEREFORE, COA prays for relief as set forth below.

### FOURTH CAUSE OF ACTION

#### (Negligent Misrepresentation)

46. COA realleges and reincorporates by reference each and every allegation contained in Paragraphs 1 through 45 of this Complaint as though fully set forth herein.

47. Before the Consulting Agreement was entered into, and then again before the Software Agreement was entered into, ACGI—both in writing and orally—made the false representations of material fact described in Paragraphs 10 through 19 and 26, *supra*, including in regards to the "centralized," "integrated," and "comprehensive" capabilities of Association Anywhere that would "reduce time, risks, and costs," and "keep COA at the forefront of innovation." These written and oral statements were more than mere "puffery," but were instead explicit statements based specifically on ACGI's purported knowledge and understanding of COA's particularized needs, and ACGI's purported ability to meet those needs.

48. ACGI's various representations, described above, were intended to induce, and did induce, COA's actual and justifiable reliance thereon, in the form of its entry into the Consulting Agreement and Software Agreement, and payment/performance thereunder. At the time ACGI made these representations, it was careless or negligent in ascertaining the truth or falsity of the representations.

49. Had COA known of the false nature of ACGI's representations, it would not have consented to entry into the Consulting Agreement or Software Agreement, nor would it have attempted and continued performance—or made payment—thereunder.

50. As a proximate result of ACGI's negligent misrepresentation, COA has been damaged in a sum to be established at trial, and in any event in excess of the minimum jurisdiction of this Court.

51. ACGI's conduct, alleged above, was carried out in reckless disregard of COA's rights,

and was willful, wanton, malicious, and outrageous conduct that subjected COA to cruel and unjust hardship in conscious disregard of COA's rights, thus warranting an award of punitive damages.

WHEREFORE, COA prays for judgment as hereinafter set forth.

## FIFTH CAUSE OF ACTION

### (Rescission)

52.     COA realleges and reincorporates by reference each and every allegation contained in Paragraphs 1 through 51 of this Complaint as though fully set forth herein.

53.     As described above, COA and AGCI entered into the above-referenced Software Agreement on June 15, 2016. Pursuant to that Agreement, in exchange for its payment of significant monetary sums to AGCI, COA was to receive an Association Anywhere system offering "centralized," "integrated," and "comprehensive" capabilities that would "reduce time, risks, and costs," and "keep COA at the forefront of innovation." Moreover, as also described above, prior to entry into the Software Agreement, AGCI—by and through its authorized representatives—made false representations designed to induce COA into executing and performing under the Software Agreement.

54.     Under the terms of the Software Agreement, COA undertook efforts, and expended monies, towards the procurement and achievement of functionality of Association Anywhere.

55.     Despite COA's multiple requests for ACGI to perform its obligations under the Software Agreement, ACGI has failed to so perform, and has additionally repudiated its obligations thereunder. At the time of that failure and repudiation, COA had performed all the conditions and things on its part to be performed, and was ready, willing, and able to continue to perform under the terms of the Software Agreement.

56.     If the Software Agreement is not rescinded, COA will be deprived of the benefit of the bargain memorialized by those documents, and suffer substantial harm and injury as a result of that deprivation.

57.     COA intends service of the Summons and Complaint in this action to serve as notice of rescission of the Software Agreement, and hereby demands that ACGI restore to COA the consideration furnished by COA; specifically, all sums of money expended by COA in conjunction

with the procurement and functionality of Association Anywhere. COA also offers to restore all consideration furnished by ACGI under the Software Agreement, on condition that ACGI restore to COA the above-described consideration furnished by COA.

WHEREFORE, COA prays for relief as set forth below.

## SIXTH CAUSE OF ACTION

**(Unfair Business Practices Under Business and Professions Code Section 17200)**

58. COA realleges and reincorporates by reference each and every allegation contained in Paragraphs 1 through 57 of this Complaint as though fully set forth herein.

59. The above-described acts, including its conducting of unlicensed business within the State of California, its written and oral publication of misrepresentations concerning the ability of ACGI and Association Anywhere to satisfy COA's specifically-articulated needs, and its demand for the payment of additional monies in order to carry out acts within the parameters of the parties' executed contracts, constitute unlawful, unfair, and/or fraudulent business acts or practices under Business and Professions Code section 17200 et seq.

46. As a result of its acts of unfair competition, ACGI has realized an unjust economic windfall, and should be made to disgorge all profits realized from its unlawful conduct described above.

WHEREFORE, COA prays for judgment as follows:

1. For damages according to proof;
2. For rescission of the Software Agreement;
3. For reasonable attorneys' fees, which fees are specifically authorized under the terms of Paragraph 13.14 of the Software Agreement;
4. For costs of suit incurred herein; and
5. For such other relief as the Court deems just and proper.

/ / /

/ / /

/ / /

/ / /

## JURY TRIAL DEMANDED

COA demands a jury trial in connection with the claims made herein.

DATED:  March 2, 2020                    WILKE FLEURY LLP


By: _____/s/ Dan Baxter_____
DAN BAXTER
Attorneys for Plaintiff
CALIFORNIA OPTOMETRIC ASSOCIATION